AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

4/22/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cd _____ DEPTUTY

United States of America

v.

EDWIN ALEXANDER ANDRADE,
DULCE KARINA CAMACHO REYES,
and JOSE MANUEL REYES,

Defendants

**FILED**
CLERK, U.S. DISTRICT COURT

4/22/22

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eb _____ DEPUTY

Case No.   2:22-mj-01602-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 15, 2022 and April 20, 2022, in the county of Los Angeles in the Central

District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Dylan Giordano
*Complainant's signature*

Dylan Giordano, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   4/22/22

*Judge's signature*

City and state:   Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Varun Behl

**AFFIDAVIT**

I, Dylan Giordano, being duly sworn, declare and state as follows:

**I. PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against   for violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A:

a.   a black iPhone 12, with IMEI 352513428852863, seized from the center console of a black 2007 Cadillac sedan with license plate 7PYL649 registered to ANDRADE ("ANDRADE'S CAR") ("SUBJECT DEVICE 1");

b.   a black iPhone SE, with IMEI 356468108909192, seized from the center console of ANDRADE'S CAR ("SUBJECT DEVICE 2");

c.   a Moto G Pure Cricket phone, with IMEI 357823320790987, seized from CAMACHO REYES's purse ("SUBJECT DEVICE 3"); and

d.   a white iPhone 12, with an unknown IMEI number, seized from CAMACHO REYES's purse ("SUBJECT DEVICE 4").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21

U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances)(the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with DEA and have been so employed since June 2019.  I am currently assigned to the Los Angeles Field Division Southwest Border 4 ("SWB4").  SWB4 is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale narcotics trafficking.

6.   I have attended DEA Basic Agent Training at the DEA Academy and received hundreds of hours of training on topics such as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications

devices, criminal law, surveillance, and other investigative
techniques.  I have assisted in investigations into the unlawful
importation, manufacture, possession with intent to distribute,
and distribution of narcotics and controlled substances, the
laundering of narcotics proceeds, and conspiracies associated
with narcotics offenses.  In conducting these investigations, I
have used a variety of investigative techniques and resources,
including but not limited to surveillance, confidential source
debriefings, telephone toll analysis, and wire communications
analysis in Title III wiretap investigations.

7.   I am familiar with the methods used by narcotics
traffickers to smuggle and safeguard narcotics, to distribute
narcotics, and to collect and launder proceeds related to the
sales of narcotics.  I am familiar with methods employed by
large-scale narcotics organizations, and the sophisticated
tactics that they routinely use in attempts to thwart the
investigation of their narcotics organizations, including the
utilization of cellular telephone (and smartphone) technology,
counter surveillance techniques, debit calling cards, public
telephones, hidden vehicle compartments, elaborately planned
smuggling schemes tied to legitimate businesses, false or
fictitious identities, and coded communications and
conversations.

8.   Prior to my employment with the DEA, I was a police
officer with the New York City Police Department since
approximately April 2017.  As a police officer, I performed
routine patrol activities and conducted arrests, including

arrests for drug offenses.

### III.  SUMMARY OF PROBABLE CAUSE

9.    On March 15, 2022, REYES sold a DEA confidential source ("CS-2")[1] approximately 186 grams of suspected fentanyl pills in exchange for $3,000.

10.    On April 10, 2022, CS-2 ordered approximately 70,000 fentanyl pills from REYES.  REYES confirmed the order and told CS-2 that REYES would call "down there"[2] and would let CS-2 know if the fentanyl pills were available.  On April 20, 2022, law enforcement agents seized approximately 11,542 grams of suspected fentanyl pills from ANDRADE and CAMACHO-REYES.  Law enforcement found approximately 20,000 suspected fentanyl pills in a blue and white cooler located in the front passenger seat of ANDRADE's CAR and approximately 50,000 suspected fentanyl pills in a blue duffel bag in the rear passenger side of a Volkswagen sedan, with license plate 8TTW586, and registered to CAMACHO REYES ("CAMACHO REYES's CAR").

---

[1] CS-2 has provided assistance to the DEA since 2018.  CS-2 has not been compensated for his/her assistance in this investigation.  Since 2018, CS-2 has been paid a total of $1,500 for all the assistance he/she has provided.  Since 2018, CS-2 has also obtained a significant public benefit parole, which allows CS-2 to remain in the United States.  CS-2 has misdemeanor convictions for being under the influence of a controlled substance, driving with a suspended license, inflicting a corporal injury on a spouse, and driving under the influence of alcohol.  CS-2 has other arrests, including transporting narcotics for sale and possession of controlled substances for sale.  CS-2 has worked with DEA on several occasions over the past four years, including as a witness in an ongoing case, and has consistently provided credible and reliable information.

[2] Based on the context of the overall conversation and my training and experience, I believe "down there" refers to REYES's source of drugs in Mexico.

11.   On April 20, 2022, agents seized SUBJECT DEVICE 1 and SUBJECT DEVICE 2 from the center console of ANDRADE'S CAR. Agents seized SUBJECT DEVICE 3 and SUBJECT DEVICE 4 from CAMACHO REYES's purse in the front passenger seat of CAMACHO REYES's CAR.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

13.   Since the beginning of June 2020, DEA special agents have been in contact with a DEA confidential source ("CS-1")[3] who has provided agents with information concerning individuals that are members of the Sinaloa cartel that traffic large quantities of methamphetamine, cocaine, and fentanyl in and around the Los Angeles area in California.

14.   In February 2022, CS-1 provided an unknown individual in Mexico a phone number belonging to CS-2 for CS-2 to purchase a sample of approximately 186 grams of fentanyl M-30 pills. That unknown individual then gave CS-2's phone number to other unknown individuals in Mexico to have someone contact CS-2 to

_____

[3] CS-1 has provided assistance to the DEA since 2012.  CS-1 has been compensated $2,500 in assistance in this investigation. Since 2012, CS-1 has been paid a total of $72,331.05 for all the assistance he/she has provided.  Since 2012, CS-1 has also obtained a significant public benefit parole, which allows CS-1 to remain in the United States.  CS-1 has misdemeanor convictions for receiving known stolen property and tampering with a vehicle.  CS-1 has other arrests, including transporting narcotics for sale and possession of controlled substances for taking a vehicle without consent of owner/vehicle theft.  CS-1 has worked with DEA on several occasions over the last 10 years and has consistently provided credible and reliable information.

coordinate a deal of said fentanyl pills.

15.  On March 2, 2022, CS-2 received multiple phone calls from a Mexican phone number ending in 7005.[4]  The caller is believed to be an unknown Mexican-based source of supply for drugs.  The caller introduced himself to CS-2 as calling on behalf of another person named "Gallero."  In these calls, the caller and CS-2 discussed a sale of approximately 1000 fentanyl M30 pills.  CS-2 asked the caller if he could provide CS-2 "little buttons."[5]  The caller informed CS-2 that he wanted a portion of the proceeds from the sale of fentanyl pills to be sent to Mexico.  CS-2 agreed to this condition.  The caller informed CS-2 that he would pass CS-2's cellphone number to another unknown individual who would then reach out to CS-2 to discuss the delivery of the fentanyl pills to CS-2.

16.  On March 8, 2022, CS-2 received a call from a Mexican telephone number ending in 2243.[6]  This caller is also believed to be another Mexican based source of supply for drugs.  The caller told CS-2 that he was contacting CS-2 on behalf of the caller's "friend."  The caller told CS-2 that if CS-2 wanted to purchase 1,000 "buttons," CS-2 would have to give the courier delivering the "buttons" eighty "cents" to the courier and give

_____

[4] These phone calls between CS-2 and the Mexican-based source of supply were in Spanish.  These calls were recorded and have been translated into English.

[5] Based on my training and experience, I believe that "little buttons" and "buttons" are coded language referring to fentanyl M-30 pills.

[6] This phone call between CS-2 and this second Mexican-based source of supply was in Spanish.  This call was recorded and has been translated into English.

twenty "cents" to Mexico.[7]  CS-2 told the caller that CS-2 agreed to the conditions of the deal.  The caller told CS-2 that someone would call CS-2 shortly.  On March 8, 2022, at approximately 1:48 p.m., CS-2 received a text message from the same number, ending in 2243, telling CS-2 that CS-2 would get a call after 4 p.m.

17.  On March 8, 2022, at approximately 5:58 p.m., CS-2 received a call from an individual believed to be REYES from 562-527-8800, a cellular telephone issued by AT&T, with IMSI 310280031616210, subscribed to REYES at 12567 Andretti Street, Moreno Valley, California, 92553, and believed to be used by REYES ("REYES Telephone 1").[8]  REYES told CS-2 that he was contacting CS-2 on behalf of "the friend."  CS-2 replied to REYES "for the buttons."  REYES responded to CS-2 by asking "Where are you at?".  CS-2 replied, "Baldwin Park."  REYES told CS-2 that he was coming from the Moreno Valley area and was heading to the Long Beach area.  REYES further told CS-2 that he could meet CS-2 after he returns from the Long Beach area.  CS-2 told REYES that CS-2 would contact REYES later.

18.  Later on March 8, 2022, CS-2 called REYES on REYES Telephone 1.  CS-2 told REYES that CS-2 is one hour away from the Baldwin Park area of California.  REYES told CS-2 to provide the directions, so REYES could estimate the amount of time it

---

[7] Based on my training and experience, I believe that the caller was referring to splitting the percentage of the proceeds from the sale of fentanyl pills after the deal was completed.

[8] The phone calls between CS-2 and REYES using REYES Telephone 1 were in Spanish.  These calls were recorded and have been translated into English.

would take him to meet with CS-2.  CS-2 sent the directions to
REYES Telephone 1.  REYES replied to CS-2 that he was
approximately one hour and twenty minutes away from CS-2.  In a
following call made from REYES Telephone 1 to CS-2, REYES told
CS-2 that he would take about two to three hours to reach CS-2.
REYES told CS-2 that he would reach out tomorrow morning to
discuss the logistics for the deal.

19.  Through queries of REYES Telephone 1 through a DEA
database that monitors financial transactions sent through
Western Union and other financial institutions, DEA agents
discovered that REYES had sent money to another individual and
had listed REYES Telephone 1 as his phone number.  Further law
enforcement database checks of REYES revealed his residence at
12567 Andretti Street, Moreno Valley, CA 92335 ("REYES'
RESIDENCE").

20.  On March 9, 2022, I obtained a ping order from the Los
Angeles County Superior Court authorizing the installation and
use of a GPS ping locator on REYES Telephone 1, which is
subscribed to REYES.  Based on the GPS ping locator, I believe
REYES' RESIDENCE to be REYES' current residence.

<u>PURCHASE OF FENTANYL PILLS FROM REYES</u>

21.  On March 15, 2022, at approximately 4:00 a.m., DEA
agents established surveillance at REYES' RESIDENCE.  Agents
observed a gray Toyota Camry with California license plate
8ZSS936 ("REYES's CAR") parked in the driveway of REYES'
RESIDENCE.  Agents saw REYES exit the residence and enter the
driver side door of REYES's CAR.  Agents then saw the REYES' CAR

leave REYES' RESIDENCE and drive to and enter a parking lot structure located on North Vermont Ave, Los Angeles, California 90027.  Agents saw REYES take out a yellow high visibility work vest and gray hard hat from the trunk of REYES's CAR and exit the parking structure.  Special Agent Martoccia identified the Hispanic male as REYES based on his prior surveillance of REYES.

22.  Around 7:05 a.m. on March 15, 2022, CS-2 received a text message from 951-907-4057 a cellular telephone issued by T-Mobile, with IMSI 310240192215669, subscribed to an unknown individual and believed to be used by REYES ("REYES Telephone 2").  Through this text message, REYES provided CS-2 with a location on where to meet REYES.  CS-2 confirmed with REYES that CS-2 and REYES will meet at approximately 10:30 a.m. to conduct the narcotics sale.

23.  Later that day, on March 15, 2022, at approximately 10:26 a.m., Special Agent Charles Yeagley saw REYES approach REYES' CAR inside the parking structure located on North Vermont Ave, Los Angeles, California 90027.  Special Agent Yeagley saw REYES take out a clear plastic bag from the trunk of REYES' CAR and then leave the parking structure.  I saw REYES approach CS-2's vehicle carrying a bundled green hand towel that appeared to have a weighted object wrapped inside of it, speak briefly with CS-2, and then enter into CS-2's vehicle.  REYES then provided CS-2 with approximately 186 grams of suspected fentanyl pills in exchange for $3,000.  REYES then exited CS-2's vehicle and walked away from the structure.

CS-2 AND REYES DISCUSS THE SALE OF 70,000 FENTANYL PILLS

24.  On April 10, 2022, at approximately 6:37 p.m., CS-2 contacted REYES on REYES Telephone 1 and made an order of approximately 70,000 "buttons" for CS-2.[9]  REYES confirmed an order of 70,000 fentanyl pills to CS-2.  REYES told CS-2 that REYES would call "down there"[10] and would let CS-2 know if the "buttons" are available.

25.  On the same day, on April 10, 2022, at approximately 10:00 p.m., CS-2 received a text message from 909-201-4266, a cellular telephone issued by AT&T, with IMSI310410302862544, subscribed to Locus Communications at 111 Sylvan Avenue, Englewood Cliffs, New Jersey 07632, and believed to be used by an unknown individual ("Unknown Telephone 3"), stating "This is the family friend about the smurfs."

26.  On April 11, 2022, at approximately 11:15 a.m., CS-2 received a text message from Unknown Telephone 3, stating "70 Tuesday."[11]  At 11:44 a.m., CS-2 received a call from Unknown Telephone 3 regarding the sale of 70,000 fentanyl pills.  CS-2 asked the unknown male calling from Unknown Telephone 3 if CS-2's number was sent to the unknown male by REYES.  The unknown

---

[9] This phone call between CS-2 and REYES was in Spanish. This call was recorded and has been translated into English.

[10] Based on the context of the overall conversation and my training and experience, I believe "down there" refers to REYES's source of drugs in Mexico.

[11] Based on my training and experience and the overall context of the conversations between CS-2 and REYES, I believe REYES passed CS-2's phone number to the unknown male using Unknown Telephone 3 who then contacted CS-2 about the sale of 70,000 fentanyl pills.

male replied yes and that they want to know about "the papers."[12]
The unknown male also asked CS-2 how much CS-2 was going to pay
for the fentanyl pills.  CS-2 replied that CS-2 was going to pay
"three" for the fentanyl pills.  The unknown males replied to
CS-2 that he thought that price was good, but he would have to
check and would need to call CS-2 back.  The unknown male
confirmed to CS-2 that they have 70,000 buttons, but told CS-2
that they have the buttons in different offices, and they are
trying to compile them to give to CS-2.

27.  On April 14, 2022, the Honorable Alka Sagar, United
States Magistrate Judge, granted the government's Application
for a Warrant Authorizing the Disclosure Cell-site and GPS
Information for REYES Telephone 1, REYES Telephone 2, and
Unknown Telephone 3.

28.  On April 14, 2022, at approximately 7:15 a.m., Unknown
Telephone 3 texted CS-2 that Unknown Telephone 3 had sent CS-2
another phone number.  CS-2 texted Unknown Telephone 3 and asked
if it was another phone number belonging to Unknown Telephone 3.
Unknown Telephone 3 replied to CS-2 that the new number was
"mine."  CS-2 informed Unknown Telephone 3 that everything is
ready, and CS-2 will contact Unknown Telephone 3 when CS-2 was
ready to do the deal.  Unknown Telephone 3 informed CS-2 that he
will contact CS-2 from the new number so CS-2 has it.  The
unknown male using Unknown Telephone 3 told CS-2 that he will
send CS-2 a message from the new phone number.

---

[12] Based on my training and experience, I believe "the
paper" refers to the payment for drugs that CS-2 would provide
during the deal.

29.  On April 14, 2022, at approximately 4:45 p.m., CS-2 received a text message from telephone number 909-452-3862 ("Unknown Telephone 4") stating to CS-2 "new."

30.  On April 19, 2022, the Honorable Michael R. Wilner, United States Magistrate Judge, granted the government's Application for a Warrant Authorizing the Disclosure Cell-site and GPS Information for Unknown Telephone 4.

### ANDRADE AND CAMACHO-REYES DELIVER
### APPROXIMATELY 70,000 SUSPECTED FENTANYL PILLS TO CS-2

31.  Between April 10 and April 19, 2022, CS-2 and the user of Unknown Telephone 4 negotiated the sale of 70,000 fentanyl pills.[13]  On April 19, 2022, Unknown Telephone 4 contacted CS-2 in preparation for the deal.  CS-2 confirmed that the deal would take place the next day on April 20, 2022.

32.  On April 20, 2022, between approximately 9:00 a.m. and 6:00 p.m., CS-2 exchanged text messages and phone calls with the user of Unknown Telephone 4.[14]  In these calls and text messages, CS-2 and the user of Unknown Telephone 4 discussed the sale of 70,000 fentanyl pills.  At approximately 3:00 p.m., CS-2 made a call to Unknown Telephone 4 to the unknown male to find out where the deal would take place.  At around 3:20, the unknown male informed CS-2 that other individuals would arrive sometime between 4:30 p.m. and 5:00 p.m. to sell CS-2 the 70,000 fentanyl

---

[13] These phone calls between CS-2 and the user of Unknown Telephone 4 were in Spanish.  These calls were recorded and have been translated into English.

[14] These phone calls between CS-2 and the user of Unknown Telephone 4 were in Spanish.  These calls were recorded and have been translated into English.

pills.  At around approximately 4:48 p.m., CS-2 again reached
out to Unknown Telephone 4 to the unknown male for an update
about the deal.  The unknown male told CS-2 that he would arrive
around 5:20 p.m. at the parking structure at the Home Depot
located at 5600 Sunset Blvd, Hollywood, California.  At
approximately 5:40 p.m., the unknown male informed CS-2 that a
woman would arrive in a car with the "material"[15] and would
confirm that CS-2 had the money.  At approximately 5:47 p.m.,
the unknown male explained to CS-2 that a man and woman would
arrive with "20"[16] and would confirm CS-2 had the money.  At
approximately 5:55 p.m., the unknown male called CS-2 and
informed CS-2 that "they" had arrived in a black Cadillac
vehicle with the "20" for CS-2.

    33.  That same day, at around 2:30 p.m., DEA agents
searched CS-2 and CS-2's vehicle at a predetermined staging
area.  No contraband was found on CS-2 or in CS-2's vehicle.  At
around 2:45 p.m., DEA agents went to the parking structure at
the Home Depot located at 5600 Sunset Blvd, Hollywood,
California to set up a surveillance team.  At the same time,
around 2:45 p.m., CS-2 drove CS-2's vehicle to the Home Depot'
parking structure.

    34.  On the same day, at around 5:30 p.m., CS-2 saw ANDRADE
drive ANDRADE'S CAR drive into Home Depot's parking structure

---

[15] Based on my training and experience and the context of
the conversations with CS-2 and the unknown male, I believe
"materials" referred to the fentanyl pills.
    [16] Based on my training and experience and the context of
the conversations with CS-2 and the unknown male, I believe "20"
referred to 20,000 fentanyl pills.

located at 5600 Sunset Blvd, Hollywood, California and park his
car.  At around 5:40 p.m., CS-2 saw CAMACHO REYES drive CAMACHO
REYES's CAR into the Home Depot's parking structure and park in
the spot right next to ANDRADE's CAR.  The windows were down in
both REYES'S CAR and CAMACHO REYES's CAR.

35.  On April 20, 2022, shortly after receiving the call
from the Unknown Telephone 4 around 5:55 p.m., CS-2 walked up to
ANDRADE's CAR.  ANDRADE was seated in the driver seat.  As CS-2
approached ANDRADE's CAR, CS-2 and law enforcement agents saw
CAMACHO REYES pass a blue and white igloo cooler through the
front driver side window of CAMACHO REYES's CAR and place it in
the front passenger seat of ANDRADE's CAR.  CS-2 and ANDRADE
discussed the sale of fentanyl pills.  CS-2 then asked ANDRADE
to open the blue and white cooler and to open the portion of the
wrapping that contained the suspected fentanyl pills so that CS-
2 could verify the pills.  ANDRADE opened an area of the
wrapping of the pills to show CS-2.  CS-2 saw blue colored
suspected fentanyl pills that resemble fentanyl M-30 pills.

36.  The GPS ping locator for REYES Telephone 2 and Unknown
Telephone 4 showed that those devices were in the vicinity of
Home Depot's parking structure located at 5600 Sunset Blvd,
Hollywood, California from around 5:30 p.m. to around 6:10 p.m.

37.  On April 20, 2022, at around 6 p.m., DEA agents
approached ANDRADE's CAR and CAMACHO REYES's CAR.  The agents
arrested ANDRADE and CAMACHO REYES and searched each of them
incident to arrest.  Agents identified ANDRADE based on his
identification contained in his wallet.  Agents asked CAMACHO

REYES for her identification.  She told officers that the agents
could take her wallet out of her purse which was in the front
passenger seat of CAMACHO REYES's CAR.  Agents took her purse,
removed her identification, and identified her based on her
identification.  Agents also seized SUBJECT DEVICE 3 and SUBJECT
DEVICE 4, which were in her purse.

38.  Agents searched ANDRADE's CAR and CAMACHO REYES' CAR.
Agents seized SUBJECT DEVICE 1 and SUBJECT DEVICE 2 from the
center console of ANDRADE's CAR.  Agents seized the blue and
white cooler, which contained approximately 20,000 suspected
fentanyl pills, from ANDRADE'S CAR.  In CAMACHO REYES's CAR,
agents found a blue colored duffel bag on the floor in the rear
passenger side.  The duffel bag contained approximately 50,000
additional suspected fentanyl pills.

39.  On April 20, 2022, around 6:10 p.m., I Mirandized
ANDRADE.  ANDRADE was receiving calls on SUBJECT DEVICE 2.  I
asked ANDRADE who was calling him.  ANDRADE answered REYES.
ANDRADE said that he works with REYES, REYES was down the
street, and that REYES told him to come up to the Home Depot
parking structure to meet a female.  ANDRADE provided agents
consent to search SUBJECT DEVICE 1 and SUBJECT DEVICE 2.

40.  At around 6:25 p.m., DEA Special Agent Martoccia
Mirandized CAMACHO REYES.  CAMACHO REYES provided agents consent
to search SUBJECT DEVICE 3 but did not provide consent to search
SUBJECT DEVICE 4.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

41.  Based on my training and experience and familiarity

with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their cell phones and other digital devices.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or

facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    42.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

    43.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may

also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

44.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

45.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

19

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ANDRADE and CAMACHO-REYES's thumb- and/or fingers on the devices; and (2) hold the devices in front of ANDRADE and CAMACHO-REYES's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

46.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

47.  For all of the reasons described above, there is probable cause to believe that ANDRADE, CAMACHO REYES, and REYES

have committed a violation of 21 U.S.C. § 841(a)(1): Possession

with Intent to Distribute a Controlled Substance.  There is also

probable cause that the items to be seized described in

Attachment B will be found in a search of the SUBJECT DEVICES

described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  22nd day of
April    , 2022.


_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE